**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION**

| | | |
|---|---|---|
| **ESTELLA HEATH,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | No. 5:15-cv-00279 |
| | : | |
| **CAROLYN W. COLVIN,** | : | **Social Security Appeal** |
| **Acting Commissioner of Social Security,** | : | |
| | : | |
| **Defendant.** | : | |
| | : | |

## REPORT AND RECOMMENDATION

This is a review of a final decision of the Commissioner of Social Security denying Plaintiff Estella Heath's application for benefits. 42 U.S.C. § 405(g). Because substantial evidence supports the Commissioner's decision, it is **RECOMMENDED** that the Court **AFFIRM**; and that Plaintiff's Motion to Remand (Doc. 15) be **DENIED**.

## BACKGROUND

### A. Procedural Background

Plaintiff filed an application for a period of disability, disability insurance benefits, and Supplemental Security Income on June 29, 2011. Tr. 178-187.[1] The Commissioner denied Plaintiff's claims both initially and upon reconsideration. Tr. 114-17, 128-34, 137-44. Plaintiff requested an administrative hearing. Tr. 145-46. The ALJ held a hearing at which Plaintiff appeared and testified. Tr. 44-75. Following the hearing, the ALJ issued an unfavorable decision

---

[1] The record reflects that this was Plaintiff's third application for benefits. Plaintiff first filed for disability and disability insurance benefits on February 17, 2007. Tr. 79. An ALJ found her not disabled on September 17, 2008. Tr. 85. On January 7, 2009, Plaintiff filed for a period of disability and disability insurance benefits. Tr. 93. An ALJ found her not disabled on June 23, 2011. Tr. 107. Plaintiff filed the application now considered six days later on June 29, 2011. Tr. 178-187.

finding Plaintiff not disabled and denying Plaintiff's claims for benefits. Tr. 10-33. Plaintiff requested review from the Appeals Council, which the Appeals Council denied. Tr. 1-7; 8-9. On July 20, 2015, Plaintiff filed her complaint in this Court. Doc. 1. The case is now ripe for review under 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3).

### B. Factual Background and the ALJ's Decision

Plaintiff, who was born on February 22, 1964, claimed disability beginning in June of 2011. Plaintiff has a high school education, and prior work experience as a twister operator, sewing machine operator, packer, and molding machine operator. Tr. 236; 20 C.F.R. § 404.1560(b)(1). Plaintiff alleged disability due to left leg problems, high blood pressure, back problems, diabetes, right shoulder problems, depression, borderline intellectual functioning, pain disorder, and osteoarthritis. Tr. 50, 230.

In rendering the unfavorable decision, the ALJ concluded that Plaintiff had not performed substantial gainful activity since June 24, 2011, the alleged onset date. Tr. 15. After conducting a hearing and reviewing the evidence of record, the ALJ determined that Plaintiff had the following severe impairments: degenerative disc disease of the lumbar spine, degenerative disc disease of the cervical spine, degenerative joint disease of the right shoulder with small rotator cuff tear, mild degenerative joint disease of the left shoulder, pain disorder, diabetes mellitus, depression, and borderline intellectual functioning. Tr. 15-16. Notwithstanding the noted impairments, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. Tr. 16. The ALJ concluded that Plaintiff retained a residual functional capacity ("RFC") to perform light work, with the following exceptions and limitations:

> occasional pushing and pulling; occasional hand controls with the bilateral upper extremities; frequent climbing of ramps and stairs; no climbing of ladders ropes or

2

scaffolds; frequent balancing; occasional stooping; no kneeling crouching or crawling; no overhead reaching with the right upper extremity; and occasional overhead reaching with the left upper extremity. The claimant should avoid concentrated exposure to dangerous machinery and heights. The claimant is further limited to occupations requiring no more than simple routine and repetitive tasks, not performed in a fast-paced production environment, involving only simple work related instructions and decisions and relatively few work place changes.

Tr. 28.

In formulating Plaintiff's RFC, the ALJ considered the entire medical record, as well as Plaintiff's subjective complaints of pain and her limitations, and determined that, although the evidence established the presence of underlying impairments that reasonably could be expected to produce the symptoms alleged, Plaintiff's statements as to the intensity, persistence, and limiting effects of her symptoms were not entirely credible. Tr. 19. The ALJ found that Plaintiff was unable to perform any past relevant work and consulted a vocational expert ("VE") who testified at the hearing. Tr. 25. The VE found that Plaintiff could perform other jobs existing in significant numbers in the national economy such as a garment sorter, a stock checker, and garment folder. Tr. 26. Thus, the ALJ found Plaintiff not disabled. Tr. 26-27.

### C.  Medical Record

In 2002, Plaintiff sustained injuries to her back due to a motor vehicle accident. Plaintiff underwent treatment of her shoulder in November 2006 and treatment of her knees starting in December 2006. Plaintiff has a longstanding treatment history for diabetes, beginning in 2006. Plaintiff was diagnosed with a depressive disorder with psychotic tendencies which, as shown later by the medical records, cycled with treatment. Her most recent treatment for pain was at Compassionate Care Clinic. She was also treated at River Edge Adult Mental Health for anxiety and depression.

Physical Impairments:

Records from Harvey Jones, M.D., show Plaintiff was under treatment for right shoulder pain, lower back pain, and left knee pain beginning in 2007. Tr. 534. Plaintiff was initially seen by Dr. Jones on April 20, 2007. Dr. Jones recalls: "on that day, … [Plaintiff] presented with complaints of bilateral knee pain, left foot pain, and lower back pain secondary to a job-related injury which occurred on 12/05/06. [Plaintiff] was employed at a Thomaston Plastic Company and she injured herself on the assembly line. The patient has been in chronic intractable pain ever since." Tr. 534. On May 18, 2007, Dr. Jones evaluated imaging reports including: (1) x-rays of the left shoulder consistent with mild degenerative disk disease, (2) x-rays of the right shoulder showing mild degenerative disk disease and partial rotator cuff tear, (3) x-rays of the left knee positive for degenerative joint disease, and lumbar x-rays showing degenerative joint disease of the lower dorsal lumbar spine and lumbar sacral spine with a compression fracture at the superior end plate at the L1 vertebra. Tr. 534. Dr. Jones' assessment was: (1) persistent bilateral shoulder pain, (2) chronic severe lower back pain due to degenerative disc disease and degenerative joint disease, (3) compression fracture of the L1 vertebra, (4) chronic left hip pain, (5) osteoarthritis of the left knee, and (6) poorly controlled diabetes Type II. Tr. 535.

An MRI of Plaintiff's right shoulder taken on May 31, 2007, at the request of Dr. Jones, showed an impression of AC Joint Bony Spurring; with consistent findings of a small tear of the Rotator Cuff. Tr. 802. An MRI of the lumbar spine taken on July 21, 2008, at the request of Dr. Jones, showed an impression of: (1) likely chronic compression at L1; and (2) small left disc protrusion at L5-S1. Tr. 801.

4

On August 6, 2008, Dr. Jones' records show the Plaintiff was in physical therapy but continued to have persistent problems with her pain, and only "minimal improvement." Tr. 570. Dr. Jones specifically addressed that "she has not been able to get any significant mobility and activities from these injuries." *Id.* Physical exams were positive for significant decreased range of motion of the right upper extremity, "considerable evidence of degenerative disk disease of the lower back," and decreased range of motion in the left knee. Tr. 570. Her neurological exam was within normal limits. Tr. 570. Dr. Jones assessed Plaintiff with: (1) Lumbar disk disease; (2) rotator cuff tear; (3) degenerative disk disease; (4) diabetes mellitus; (5) nervous disorder; and (6) osteoarthritis. Tr. 571. Plaintiff was encouraged to follow-up with an orthopedist, a neurologist, and a neurosurgeon. Tr. 571.

In a letter dated October 7, 2009, Dr. Jones noted that Plaintiff suffered from a compression fracture, rotator cuff tear, bilateral carpal tunnel syndrome, and problems with her knee, such that she was "unable to return to work in either of her two jobs she once described to me at the plastics factory or the sewing company." Tr. 598. Dr. Jones noted the Plaintiff had significant trouble sitting and standing for long periods of time due to her injuries, "even without consideration of her low back condition." *Id.* She had significant difficulty with repetitive motion activities involving her upper right extremity and right-sided upper extremities use. *Id.* He noted that Plaintiff was limited in reaching overhead, climbing, lifting, or repetitive use of her hands or fingers. *Id.* He also wrote in the letter that she changed her primary care physician earlier in the year to another doctor, "due to transportation problems, and the lack of viable insurance to pay her medical expenses." Tr. 598.

Medical records from March 24, 2009, to October 6, 2009, show Plaintiff received treatment at Tendercare Clinic for: (1) back and shoulder; (2) diabetes; (3) obesity and

hyperlipidemia; and (4) chronic pain. Tr. 577-88. During this time a CT scan on Plaintiff's abdomen on April 15, 2009, revealed a fatty liver and a small right ovarian cyst. Tr. 591. A follow-up was recommended. *Id.* Plaintiff reported that she was hospitalized in 2009 for chest pain, but those records are not in the transcript. Tr. 511.

A physical exam by Dr. Rashmi Hooda, of Cardiopulmonary Associates, was conducted on February 25, 2010, at the request of the agency. Tr. 838-45. Dr. Hooda reviewed the Plaintiff's x-rays of the lumbar and shoulders bi-laterally. Tr. 840-41. Plaintiff was noted to have been hospitalized at Oconee Regional Medical Center in October of 2009, due to upper extremity pain. Tr. 839. At the time of the evaluation, Plaintiff was taking: Metformin HCL 500mg; Ibuprofen 800mg, Famotidine 20mg, Methocarbamol 500mg, Novolin 70/30, and Moniperal 20mg. Tr. 839. The Plaintiff's grip strength was found to be reduced to 3/5 bilaterally, with decreased range of motion in her back, and cervical spine. Tr. 840. Plaintiff had a positive straight leg raising test, and decreased flexion in the knees bi-laterally, decreased range of motion in the hips, and decreased flexion in the knees. *Id.* The Plaintiff could not walk heel to toe or squat. *Id.* Motor function was decreased in all extremities to 3/5. *Id.* Dr. Hooda noted that Plaintiff's: (1) shoulder x ray showed moderate subacromial spur within the AC joint bilaterally, with joint space narrowing compatible with osteoarthritic change, as well as degenerative changes along the AC joints, consistent with reports of moderate to severe pain; (2) lumbar x-ray showed early degenerative changes at L5/S1, consistent with moderate to severe pain; and (3) knee x-ray showed decreased flexion in the knees, suggesting a mild limitation. Tr. 840-41. Despite these findings, Dr. Hooda noted that Plaintiff "ambulate[d] normally, and without the use of an assistive device." Tr. 840. Plaintiff had "no trouble" getting on and off the exam table, and "ha[d] no difficulty with balance." Tr. 840.

Medical reports from Oconee Regional Medical Center ("ORMC") dated February 25, 2010, are consistent with Dr. Hooda's assessment. Imaging of the bi-lateral shoulders showed degenerative changes along the AC joints. Tr. 344. Imaging of Plaintiff's lumbar spine was unremarkable, but "minimal early degenerative changes at L5/S1" were noted. Tr. 343.

A CT of Plaintiff's cervical spine taken at ORMC on June 23, 2010, showed moderate changes of degenerative disk disease noted at C5-6 and C6-7 with possible bulges. Tr. 367. X-rays of the chest from the same day were positive for nodular densities in the perihilar regions, most likely representing remote granulomatous disease. Tr. 368. Two views of Plaintiff's left knee from July 1, 2010, showed mild osteoarthritic changes with no significant joint effusion. Tr. 400. Three views of the left shoulder were obtained the same day, and were essentially normal. Tr. 342. X-rays from July 16, 2010, revealed mild degenerative changes in Plaintiff's lumbar spine. Tr. 401. On July 23, 2010, a CT scan of Plaintiff's abdomen revealed a fatty liver, consistent with her April 15, 2009, CT scan, but showed that her right ovarian cyst had resolved. Tr. 403.

Dr. Sudershan Hooda of Cardiopulmonary Associates of Central Georgia noted on September 6, 2010, that Plaintiff was recently involved in a motor vehicle accident in which she suffered severe back pain that restricted her daily living activities. Tr. 601. X-ray imaging of Plaintiff's lumbar spine completed on January 19, 2011, revealed a stable appearance, unchanged since July of 2010. Tr. 351.

On July 20, 2011, Plaintiff reported to Compassionate Care Clinic with complaints of back pain. Tr. 811. She reported that she was able to pick up glasses off the floor, and the nurse observed that she was able to get up and down from the chair to the exam table. Tr. 811.

On September 8, 2011, Dr. Hooda completed an exam for the purpose of providing information to the disability agency. Tr. 420-22. At that time Dr. Hooda noted that Plaintiff had been involved in an automobile accident with a horse the previous year, and went to the hospital after her accident. Tr. 420. She described her pain as moderate to severe pain that remained constant. *Id.* Plaintiff stated she could walk and stand for about ten to fifteen minutes until she had to stop and rest. *Id.* She was following up with her primary care physician every month and was taking pain medication for routine follow up. *Id.* She was also dealing with right shoulder pain, and told Dr. Hooda that she was recommended to have a rotator cuff surgery but could not afford it. *Id.* She felt sharp shooting pain in her right shoulder and felt it radiating up to her neck. *Id.* As for her functional status, Plaintiff reported to Dr. Hooda that she was able to dress herself, and do light household chores. She was able to drive short distances and could climb stairs with only "mild difficulty." Tr. 420.

Upon physical examination, Dr. Hooda noted that Plaintiff's spine was straight and non-tender, with no muscle tenderness, and that she walked with a normal gait and had full grip strength in her upper extremities. Tr. 422. Plaintiff suffered from a decreased range of motion in her back and right shoulder, although range of motion in her cervical spine was normal. She could heel and toe walk and could squat with only "mild difficulty." Tr. 422. Motor function was 4/5 in her upper right extremity and 5/5 in all other extremities. Tr. 422.

On March 1, 2012, Plaintiff reported to Compassionate Care Clinic with complaints that her back pain was "just getting worse." Tr. 810. Specifically, the pain radiated from her lumbar spine down to the feet. *Id.* Plaintiff was referred to Serenity for physical therapy to treat her sciatica, and for an evaluation. *Id.* Plaintiff's tramadol prescription was refilled. *Id.*

On March 10, 2012, Plaintiff was assessed for physical therapy. Tr. 817. At that time, Plaintiff's current level of functioning indicated that she had difficulty with "prolonged" sitting or driving "greater than fifteen" minutes, standing/walking "greater than five minutes," sleeping on the couch, and problems with lifting, carrying, bathing, and dressing. Tr. 817. She was able to do light housekeeping, laundry, and cooking, but was unable to sweep, vacuum, or lift. Tr. 817. Upon physical examination, the therapist found positive straight leg raising bilaterally, decreased range of motion in the lumbar spine, and decreased strength in the lumbar spine. *Id.* Plaintiff was also noted to have neurological symptoms in the right hip and left leg, and limited ambulation with significant antalgia. Tr. 818. Plaintiff's physical symptoms and signs were consistent with sciatica, and it was noted Plaintiff's pain was "significantly affecting normal activities." *Id.* "Plaintiff's symptoms appear to act mechanically, suggesting a good [prognosis] for [physical therapy]." *Id.*

On April 5, 2012, Plaintiff's hip pain was reduced to 0/10 after therapy. Tr. 820. As of the last note on April 23, 2012, Plaintiff continued to have palpable lumbar muscle spasms, but she was able to complete "gentle exercises/activities with minimal pain increase." Tr. 822.

On April 25, 2012, Plaintiff reported "all over body pain," stating that her "body was in turmoil." Tr. 809. She indicated that she had stopped taking insulin. Tr. 809. She clarified that she had been going to therapy but stopped after an emergency room visit on April 16. *Id.* She was diagnosed with insulin dependent diabetes mellitus, lumbar back pain, and chronic pain. *Id.* Her tramadol was refilled. On her next visit to Compassionate Care, on February 21, 2013, Plaintiff still complained of low back pain, with numbness and pain on the left side. Tr. 808.

On June 28, 2013, Plaintiff was seen in regard to complaints of pain and swelling radiating down her left leg and foot. Tr. 807. Her medications were refilled and no other action

was taken. *Id.* On August 23, 2013, Plaintiff reported "feeling bad," with pain on the left side of her body. Tr. 806. Plaintiff's medications at that time included Lasix, Metformin, Glimepiride, Fumotidine, Flexeril, Tramadol, and Lortab. *Id.*

<u>Mental Health Treatment</u>

As to Plaintiff's mental impairments, medical evidence of Plaintiff's mental impairments prior to 2010 exists only in a summary by a previous ALJ. See Tr. 90-113. With regard to Plaintiff's complaints of difficulty sleeping and concentrating, one consultative medical examiner opined in April of 2009, "it is no wonder that she is overly sedated and sleeps most of the day," considering the amount of medication she was taking. Tr. 101. He attributed the majority of her mental impairments to the "effects of polypharmacology." Tr. 101.

On May 26, 2010, Michael P. Rose, Ph.D., completed a consultative psychological evaluation of the Plaintiff and assessed her with psychological features, a pain disorder, and dysthymic disorder due to her reported chronic pain and depressed mood. Tr. 333-338. Plaintiff achieved a Full Scale IQ score of 75 on Wechsler Adult Intelligence Scale Fourth Edition (WAIS-IV). Tr. 335. Dr. Rose assessed her Global Assessment Functioning score to be 58, indicating borderline moderate to mild symptoms or difficulty in functioning. Tr. 336. Dr. Rose opined that Plaintiff is "capable of understanding and carrying out simple instructions" and has the "ability to get along with the public, supervisors, and/or coworkers." Tr. 336.

Of note, according to Dr. Rose's report, Plaintiff indicated she spent most of her time reading the Bible or watching television, and also acknowledged helping her children with dishwashing and cooking. Tr. 334. She reported shopping with her daughter and even drove herself to the local convenience and grocery store. *Id.* Dr. Rose found that Plaintiff presented as a cooperative but relatively low-functioning individual who was not able to provide much

information about her present condition. Tr. 335. He noted many of her responses lacked specificity and detail. *Id.* While she initially presented in a "vigilant demeanor," that changed to cooperation when interviewed alone, and she demonstrated no major problems with attention, concentration, or memory. *Id.*

On September 6, 2011, Audrey S. Courtney, Ph.D., completed another psychological evaluation of Plaintiff and reported that her "psychological condition [did] not appear to be the major interfering factor in her ability to function on a day-to-day basis." Tr. 413-419, 416. Upon mental status examination, Plaintiff "demonstrated adequate energy and no problems with speed of performance were noted." Tr. 415. Dr. Courtney assessed Plaintiff's Global Assessment Functioning score to be 65. *Id.* She stated that Plaintiff appeared to have some cognitive limitations based on her previous evaluation resulting in a Borderline Intellectual Functioning IQ score, but that Plaintiff "seemed to be exaggerating her mental condition during this evaluation." Tr. 416. She further noted that Plaintiff "demonstrated some problems following instructions but that appeared to be more a function of the unfamiliarity of the task." *Id.* While Plaintiff reported difficulties in a work setting "getting along with the other women," she reported no problems with supervisors. Tr. 415-16. Dr. Courtney opined that Plaintiff appeared "able to sustain focus to complete tasks," but may have "some difficulty with interpersonal relationships in any situation." Tr. 416.

On September 8, 2011, Dr. Hooda completed an exam for the purpose of providing information to the disability office. Tr. 420-22. Though the exam was generally focused on Plaintiff's physical impairments, upon mental evaluation, Dr. Hooda found Plaintiff "alert and oriented," and was able to follow simple and complex commands. Tr. 422. Plaintiff was also very cooperative with her exam. Tr. 422.

River Edge Mental Health treatment notes dated August 6, 2012, noted that Plaintiff was experiencing depressed mood, difficulty sleeping, difficulty concentrating, low energy, anhedonia, poor appetite, crying spells, and daily irritability. Tr. 508-13. A mental status exam the following week revealed a client who was alert and cooperative, but had a blunted affect, suffered from auditory hallucinations, and displayed a depressed mood. Tr. 514-19. Plaintiff's GAF score was noted to be 45 at the time. Tr. 523. Plaintiff's diagnosis included Major Depressive Disorder, Recurrent, and Severe with Psychotic Features. Tr. 522.

River Edge records dated September 12, October 10, and November 13, 2012, show that Plaintiff continued treatment. Tr. 696-707. Plaintiff's treatment goals included decreasing symptoms of sadness/depression, irritability, losing temper, and withdrawal from others. Tr. 696. Plaintiff's objectives included: (1) decreasing crying episodes, and (2) "living beyond" anxiety and depression to decrease symptoms. Plaintiff was taking Remeron l5mg, Ability 10mg Klonopin 0.5mg, and Zoloft 100mg. Tr. 701. At her September and October evaluations, Plaintiff was noted to be alert, calm, and coherent, and denied hallucinations. Tr. 697, 701. In November, Plaintiff again complained of auditory hallucinations. Tr. 705.

On February 21, 2013, Plaintiff was noted as having reduced episodes of panic attacks and her depression was a 5 on scale of 1-10. Tr. 681. Plaintiff was having increased sleep due to the depression. Tr. 681. On March 20, 2013, the Plaintiff's depression has worsened to a 10 on scale of 1-10. Tr. 684. Plaintiff was having mood swings, and was irritable at times, hearing voices at times, and seeing things. Her sleep was also decreased. Tr. 684. On April 17, 2014, the Plaintiff had high anxiety on a scale of 10 out of 10. Tr. 687. Plaintiff continued to have auditory hallucinations, with a little improved sleep with medications. Tr. 687. Plaintiff reported waking up in the middle of the night, crying spells three times a week, and a lack of energy or desire to

be around people. *Id.* On May 15, 2013, the Plaintiff was noted to have a flat affect with a depressed mood, but reported good appetite, sleep, and no psychosis. Tr. 690. Plaintiff indicated to Ms. Hilson that the Cymbalta, Risperdal, and Vistaril were working. Tr. 690.

On September 20, 2013, Ms. Snead completed a mental RFC evaluation and found Plaintiff to have marked limitations in Understanding and Memory, in Sustained Concentration and Persistence, in Social Interaction, and in Adaptation. Tr. 813-14. She further stated Plaintiff had organic symptoms of mental dysfunction, most likely related to past traumas and ongoing health problems, poor memory, poor concentration, mood lability, extreme periods of depression, and ongoing anxiety that would profoundly affect her ability to perform on the job. Tr. 815. She found that Plaintiff required consistent help with daily activities, was unable to function without the help of her children, and was unable to go to doctor's appointments, prepare her meals, or clean the house. Tr. 815.

## APPLICABLE STANDARDS

Social Security claimants are "disabled" if they are unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations outline a five-step sequential evaluation process for determining whether a claimant is disabled: "(1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of impairments; (4) based on a residual functional capacity ("RFC") assessment, whether the claimant can perform any of his or her past relevant work despite the

impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's RFC, age, education, and work experience." *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011). (citing 20 C.F.R. §§ 404.1520(a)(4)(i)-(v); 416.920(a)(4)(i)-(v)).

Judicial review of a decision of the Commissioner of Social Security is limited to a determination of whether that decision is supported by substantial evidence, as well as whether the Commissioner applied the correct legal standards. *Winschel*, 631 F.3d at 1178. "Substantial evidence" is defined as "more than a scintilla," and as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* The Eleventh Circuit has explained that reviewing courts may not decide the facts anew, reweigh the evidence, or substitute their judgment for that of the Commissioner. *Id.* Rather, if the Commissioner's decision is supported by substantial evidence, that decision must be affirmed even if the evidence preponderates against it.

## ANALYSIS

Plaintiff does not challenge the ALJ's determinations at Steps One, Two, or Three of the evaluation process. Instead, Plaintiff argues that the Administrative Law Judge's decision did not properly evaluate and assess Plaintiff's mental health limitations in determining her residual functional capacity. Specifically, Plaintiff challenges the weight accorded to Ms. Kanesha Snead, and the ALJ's interpretation of medical evidence from Plaintiff's physical therapist and River Edge Behavioral Center.

### Plaintiff's RFC Determination

A Plaintiff's RFC is "the most [she] can still do despite [her] limitations." 20 C.F.R. § 404.1545(a)(1). The determination of the RFC is an administrative assessment based on all the

evidence of how Plaintiff's impairments and related symptoms affect her ability to perform work-related activities. 20 C.F.R. § 404.1545(a); *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997). The regulations state that the final responsibility for assessing a claimant's RFC rests with the ALJ, based on all the evidence in the record. See 20 C.F.R. §§ 404.1527(e)(2), 404.1545(a)(3), 404.1546(c), 416.927(e)(2), 416.945(a)(3), 416.946(c). Relevant evidence includes medical reports from treating and examining sources, medical assessments, and descriptions and observations of a claimant's limitations by the claimant, family, neighbors, friends, or other persons. See 20 C.F.R. §§ 404.1545(a)(3), 416.945(a) (3).

When deciding the evidence: "the testimony of a treating physician must be given substantial or considerable weight unless good cause is shown to the contrary." *Crawford v. Commissioner of Soc. Sec.*, 363 F.3d 1155, 1159 (11th Cir. 2004) (citations and internal quotations omitted). The ALJ may discount the treating physician's report where it is not accompanied by objective medical evidence, is wholly conclusory, or is contradicted by the physician's own record or other objective medical evidence. *Id*.; see also *Green v. Social Sec. Admin.*, 223 Fed. App'x. 915, 922–23 (11th Cir. 2007) (ALJ had good cause to devalue a treating physician's opinion where it was inconsistent with the objective medical evidence, as well as plaintiff's testimony). The Eleventh Circuit has enumerated factors the ALJ must consider when declined to give the treating physician's opinion controlling weight:

> When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the medical opinion based on the: (1) length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the medical evidence and explanation supporting the opinion; (4) consistency with the record as a whole; (5) specialization in the pertinent medical issues; and (6) other factors that tend to support or contradict the opinion.

*Weekley v. Commissioner of Soc. Sec.*, 486 Fed. App'x. 806, 808 (11th Cir. 2012) (citing 20 C.F.R. § 404.1527(c)). Further, when an ALJ articulates specific reasons for declining to give a treating physician's opinion controlling weight, and the reasons are supported by substantial evidence, there is no reversible error. *See Forrester v. Commissioner of Social Sec.*, 455 Fed. App'x. 899, 902 (11th Cir. 2012) ("We have held that an ALJ does not need to give a treating physician's opinion considerable weight if evidence of the claimant's daily activities contradicts the opinion."). Indeed, an ALJ "may reject any medical opinion, if the evidence supports a contrary finding." *Id.* at 901.

Further, "[i]n appropriate circumstances, opinions from State agency medical and psychological consultants ... may be entitled to greater weight than the opinions of treating or examining sources." SSR 96–6p. The weight given to a non-examining consultant's opinion depends on "the extent to which it is supported by clinical findings and is consistent with other evidence." *Jarrett v. Comm'r of Soc. Sec.*, 422 Fed. App'x. 869, 873 (11th Cir. 2011); see also *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1160 (11th Cir. 2004).

The Court must also be aware that some opinions, such as whether a claimant is disabled, the claimant's residual functional capacity, and the application of vocational factors "are not medical opinions, ... but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(e), 416.927(d). The Court is interested in the doctors' evaluations of the claimant's "condition and the medical consequences thereof, not their opinions of the legal consequences of his [or her] condition." *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997). Such statements by a physician are relevant to

the ALJ's findings, but they are not determinative, as it is the ALJ who bears the responsibility for assessing a claimant's residual functional capacity. See, e.g., 20 C.F.R. § 404.1546(c).

Nurse Practitioner Keshena Snead

Plaintiff argues that the ALJ erred in rejecting the mental and physical limitation evaluation of her treating nurse practitioner, Keshena Snead, at River Edge. Doc. 15-1 at 11. Plaintiff maintains that although Ms. Snead is not technically an "acceptable medical source," SSR 06-03p allows the Commissioner to use evidence from "other sources," such as nurse practitioners, to show the severity of a claimant's impairments and how they affect the claimant's ability to function. Doc. 15-1, p. 12-16. Thus, Plaintiff argues that the ALJ erred in assigning little weight to Ms. Snead's opinion. *Id*. Review of the record shows that the ALJ did not err but considered Ms. Snead's opinion and rejected it because the opinion was inconsistent with the substantial medical evidence in this case.

The regulations are clear that a nurse practitioner is not an "acceptable medical source" for purposes of establishing an impairment. See 20 C.F.R. §§ 404.1513(a), 416.913(a). A nurse practitioner may, however, be considered as an "other" medical source used "to show the severity of impairments and how the impairments affect ability to work." 20 C.F.R. § 404.1513(d)(1)). Opinions from nurse practitioners are "important and should be evaluated on key issues such as impairment severity and functional effects." See SSR 06–03p.

SSR 06–03p provides, in part:

In addition to evidence from "acceptable medical sources," we may use evidence from "other sources," as defined in 20 CFR 404.1513(d) and 416.913(d), to show the severity of the individual's impairment(s) and how it affects the individual's ability to function. These sources include, but are not limited to:

... nurse practitioners, physician assistants, licensed clinical social workers, naturopaths, chiropractors, audiologists, and therapists; .... Information from these

"other sources" cannot establish the existence of a medically determinable impairment. Instead, there must be evidence from an "acceptable medical source" for this purpose. However, information from such "other sources" may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function. ...

With the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not "acceptable medical sources," such as nurse practitioners, physician assistants, and licensed clinical social workers, have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists. Opinions from these medical sources ... are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file. ...

Although 20 CFR 404. 1527 and 416.927 do not address explicitly how to evaluate evidence (including opinions) from "other sources," they do require consideration of such evidence when evaluating an "acceptable medical source's" opinion. ...

Since there is a requirement to consider all relevant evidence in an individual's case record, the case record should reflect the consideration of opinions from medical sources who are not "acceptable medical sources" and from "non-medical sources" who have seen the claimant in their professional capacity. Although there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to opinions from these "other sources," or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case.

SSR 06-03p, 2006 WL 2329939 (Aug. 9, 2006).

In this case, the record shows that the ALJ evaluated Ms. Snead's opinion that Plaintiff is unable to work because of her "poor memory and concentration that affect her ability to complete work-related tasks." Tr. 23. The ALJ specifically found that the opinion was inconsistent with Plaintiff's treatment history, consultative examinations reports, mental status examinations findings, and reported activities of daily living. Tr. 24. Substantial evidence in the record supports this determination.

The record shows that Ms. Snead[2] treated Plaintiff at the River Edge Behavioral Center from September 2012 to August 2013. Tr. 696-779. Office notes from Ms. Snead on September 12, 2012, reflect that Plaintiff was being seen for a medication follow up. Tr. 696-97. Plaintiff denied side effects from the medication, but continued to have depression, difficulty sleeping, and low energy. Tr. 697. Ms. Snead found Plaintiff alert, her memory "grossly intact," her thought process "coherent," and her thought content "normal." Tr. 697. On October 10, 2012, Plaintiff was seen again for a medication follow up. Tr. 701. Again, Ms. Snead found Plaintiff alert, her memory "grossly intact," her thought process "coherent," and her thought content "normal." Tr. 701. Ms. Snead did not see Plaintiff again until April 17, 2013, for a medicine management appointment. Tr. 734. Upon psychiatric evaluation, Ms. Snead found Plaintiff aware of current events and past history, able to maintain concentration with a normal attention span, alert, her memory "grossly intact," and her thought process "coherent." Tr. 741-42. Ms. Snead made similar findings on May 15, 2013 (Tr. 771-72), and August 14, 2013 (Tr. 788). During all of these evaluations, Ms. Snead found Plaintiff to have functional ability as to her activities of daily living, social situations, and medical condition.

Despite the above stated treatment history, in a September 20, 2013, mental RFC evaluation, Ms. Snead found Plaintiff to have "marked" limitations on functioning in Understanding and Memory, Sustained Concentration and Persistence, Social Interaction, and Adaptation. Tr. 813-14.  She further stated Plaintiff had organic symptoms of mental dysfunction, most likely related to past traumas and ongoing health problems, along with poor memory, poor concentration, mood lability, extreme periods of depression, and ongoing anxiety that would profoundly affect her ability to perform on the job. Tr. 815. She found that Plaintiff

---

[2] The record reflects that sometime in 2013, Keshana Snead changed her name from Keshana Goddard.

required consistent help with daily activities, was unable to function without the help of her children, and was unable to drive to doctor's appointments, prepare her own meals, or clean her house. Tr. 815. This opinion is inconsistent with Ms. Snead's own previous clinical findings and treatment history.

In addition, the ALJ found Ms. Snead's opinion inconsistent with other medical evidence of record, including consultative examination reports, mental status examination findings, and reported activities of daily living. Tr. 24. As the ALJ noted, on May 26, 2010, Michael P. Rose, Ph.D., completed a consultative psychological evaluation of the Plaintiff and assessed her with psychological features, a pain disorder, and dysthymic disorder due to her reported chronic pain and depressed mood. Tr. 333-338. Plaintiff achieved a Full Scale IQ score of 75 on Wechsler Adult Intelligence Scale Fourth Edition (WAIS-IV). Tr. 335. He also assessed her Global Assessment Functioning score to be 58, indicating borderline moderate to mild symptoms or difficulty in functioning Tr. 336. Dr. Rose opined that Plaintiff is "capable of understanding and carrying out simple instructions" and has the "ability to get along with the public, supervisors, and/or coworkers." Tr. 336.

Of note, according to Dr. Rose's report, Plaintiff indicated she spent most of her time reading the Bible or watching TV but also acknowledged helping with dishwashing and cooking. Tr. 334. She reported she enjoyed shopping with her daughter and even drove herself to the local convenience and grocery store. *Id.* With respect to his clinical findings, Dr. Rose found that Plaintiff presented as a cooperative but relatively low-functioning individual who was not able to provide much information about her present condition. Tr. 335. He noted many of her responses lacked specificity and detail. *Id.* While she initially presented in a vigilant demeanor, that

changed to cooperation when interviewed alone, and she demonstrated no major problems with attention, concentration or memory. *Id.*

On September 6, 2011, Audrey S. Courtney, Ph.D. completed another psychological evaluation of Plaintiff and reported that her "psychological condition [did] not appear to be the major interfering factor in her ability to function on a day-to-day basis." Tr. 413-419, 416. Upon mental status examination, Plaintiff "demonstrated adequate energy and no problems with speed of performance were noted." Tr. 415. Dr. Courtney assessed her Global Assessment Functioning score to be 65, and stated that Plaintiff appeared to have some cognitive limitations based on her previous evaluation resulting in a Borderline Intellectual Functioning IQ score, but that Plaintiff "seemed to be exaggerating her mental condition during this evaluation." Tr. 415-16. She further noted that Plaintiff "demonstrated some problems following instructions but that appeared to be more a function of the unfamiliarity of the task." *Id.* While Plaintiff reported difficulties in work settings exhibited by difficulties "getting along with the other women she works with," she reported problems with supervisors. Tr. 415-16. Dr. Courtney opined that Plaintiff appeared "able to sustain focus to complete tasks," but may have "some difficulty with interpersonal relationships in any situation." Tr. 416.

As to Plaintiff's reported activities of daily living, they are also inconsistent with Ms. Snead's evaluation. The ALJ noted that Plaintiff is "independent for self-care activities, completes light household chores, prepares simple meals, goes shopping, and drives a car occasionally." Tr. 25, 58-59. Plaintiff testified at the hearing that she washes dishes, fixes herself lunch, tries to "help out around the house as much" as she can, and does laundry. Tr. 58. As stated above, Dr. Rose noted that Plaintiff spends most of her time reading the Bible or watching TV but also acknowledged helping with dishwashing and cooking. Tr. 334. Drs. Kevin Santulli

and Stephen Watley, state agency physicians, remarked that as of September and October of 2011, Plaintiff was still driving, shopping at least once a month, and performing personal hygiene tasks. Tr. 432, 455. On September 6, 2011, Plaintiff told Dr. Courtney that she was not able to cook, and her children took care of her house, but on September 8, 2011, she reported to Dr. Hooda that she was able to dress herself and do light household chores. Compare Tr. 414 to Tr. 420. These activities are inconsistent with Ms. Snead's findings that Plaintiff requires consistent help with daily activities; that she is unable to function without the help of her children, and that she cannot make it to doctor's appointments, prep meals, or clean the house by herself.

Based on the foregoing, the ALJ properly evaluated Ms. Snead's opinion as an "other source" and properly assigned little weight to her opinion that Plaintiff is unable to work, given the inconsistency of the opinion with the substantial evidence in this case. See *Coralic*, 2014 WL 6065757 at *9-10 (finding no error in ALJ's evaluation of nurse practitioner's opinion, together with the rest of the medical evidence, and assignment of little weight where the opinion was "not consistent with the medical evidence ... or with Plaintiff's activities.").

<u>Other Evidence</u>

As for Plaintiff's argument that the ALJ misinterpreted medical evidence from Plaintiff's physical therapist and her treatment at River Edge Behavioral Center, those claims are not a basis for remand. This court has a "narrowly circumscribed nature," which precludes it from re-weighing the evidence or substituting the court's judgment for that of the Commissioner, "even if the evidence preponderates against the decision." See *Moore*, 405 F. 3d at 1213 (quoting *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983). Substantial evidence supports the

ALJ's determination that Plaintiff has the RFC for a range of light work, with the stated restrictions.

The ALJ noted Plaintiff's physical therapist stated "skilled physical therapy would return [Plaintiff] to normal functioning and activity level" and that Plaintiff's hip pain was reduced to 0/10 after treatment. Tr. 20, 820. This diagnosis supports the ALJ's RFC finding. Even if the ALJ did misinterpret the records from Plaintiff's physical therapy, the records are not entitled to any specific weight because they constitute "other sources" as defined by the regulations. See *Ithier v. Astrue*, No. 1:11–cv–238–GRJ, 2013 WL 1092197, at *6 (N.D.Fla. Mar.14, 2013) (other medical source's opinions not entitled to any particular weight); *Yerger v. Astrue*, No. 8:11–cv–1944–T–30TBM, 2012 WL 5907056, at *4 (M.D.Fla. Nov.5, 2012) (other medical source's opinions not entitled to deference but may be considered with other evidence).

Plaintiff also challenges the ALJ's omission of various complaints from Plaintiff's visit at River Edge on May 15, 2013, specifically in regard to her complaints of hearing voices. The page Plaintiff cites, Tr. 106, is part of an earlier ALJ decision, not a medical record from River Edge. See Tr. 106.[3] A review of the record reflects that while Plaintiff *did* complain of seeing shadows and hearing voices when she presented to River Edge, and the ALJ failed to mention her complaint, Plaintiff's mental assessment on that day noted that Plaintiff was alert, calm, coherent, and *denied hallucinations*. Compare Tr. 767 to 771-72. The ALJ's other mistaken citations are harmless error, as the record contains substantial evidence to support Plaintiff's RFC. Accordingly, the Commissioner must be affirmed.

---

[3] Incidentally, the Plaintiff points out that the ALJ's citations in the decision do not correspond to the correct treatment records; Plaintiff suffers from the same "problem." See Pl.'s Brief, p. 14.

## CONCLUSION

After a careful review of the record, it is **RECOMMENDED** that the Commissioner's decision be **AFFIRMED**, and Plaintiff's Motion to Remand (Doc. 15) be **DENIED.** Pursuant to 28 U.S.C. § 636(b)(1), the parties may serve and file written objections to this Recommendation, or seek an extension of time to file objections, <u>WITHIN FOURTEEN (14) DAYS</u> after being served with a copy thereof. The District Judge shall make a de novo determination of those portions of the Recommendation to which objection is made. All other portions of the Recommendation may be reviewed for clear error.

The parties are further notified that, pursuant to Eleventh Circuit Rule 3-1, "[a] party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions if the party was informed of the time period for objecting and the consequences on appeal for failing to object. In the absence of a proper objection, however, the court may review on appeal for plain error if necessary in the interests of justice."

**SO RECOMMENDED**, this 1st day of July, 2016.

s/ Charles H. Weigle_____
Charles H. Weigle
United States Magistrate Judge